Good morning, Judge. May it please the court and counsel, I am Dwayne Kennedy and I represent the appellant, Jonathan Jacobson. I've told the clerks that I'd like to reserve five minutes to respond if needed. All right, you'll just have to watch your clock there and sit down when you wish. And if you could just pull that microphone down a little bit so we can hear you better, that would be appreciated. In Sexton, this court said that the law to be applied is the law existing at the time of the alleged violation. The alleged violation in this case is September of 2009. This court has said that a strip search is inherently humiliating and degrading. The Seventh Circuit called it demeaning, dehumanizing, and repulsive. I think those definitions were correct and that was good law, but in Florence in 2012 that moved away from that definition in law. In Appelli's brief in both the district court and here, it relied on Florence, which was not the law to be applied in this case. The law that should be applied to this case is Smook, and there the court said, quote, that strip searching arrestees for non-felony offenses without individualized determination of reasonable suspicion that the arrestee was or is likely to be carrying or concealing weapons, drugs, or other contraband, violates the Fourth Amendment, end quote. Well, wait a minute. I know something about Smook. That was about a juvenile, and the court held that the strip search was reasonable, so the part you're quoting was not the holding of that case. I'm not seeing it right now. What page is that from? Do you have the page number? I don't have the page number, Judge. It's at page 5 and 6 of Plaintiff's brief into the district court. Yeah. Well, I think we were quoting maybe the Second Circuit in an earlier case, which had said that. But in any event, go ahead. Thank you, Judge. If that be the law, and applying that law to this case, then Voltaire, the one defendant before the strip search, had no reasonable suspicion or probable cause that Jacobson had taped something under his scrotum or inserted something into his anal opening. Before McCormick stops Jacobson, Jacobson didn't know he was going to be stopped. He had no idea that he was going to jail. There was no reason for him to believe that he had had to smuggle something into the jail. Shortly after the stop, McCormick places handcuffs on Jacobson with Jacobson's hands behind his back, and from that point on, Jacobson can't reach under his scrotum or to his anal opening. McCormick then searches Jacobson's clothing. This is still out at the scene. And searches his car. And then McCormick transports Jacobson to the jail garage, and Jacobson is removed from the squad car. His clothes are searched for the second time in the squad car's search. During those two searches, nothing suspicious is found. The two defendants then take Jacobson to the strip search room and order him to remove all of his clothing. As Jacobson hands them his clothing, they search his clothing for the third time, and still nothing suspicious is found. At this point, Voltaire is required to determine if he has probable, has reasonable suspicion or probable cause to suspect that Jacobson has something hidden under his scrotum or up his anus, or he can't do the strip search. He had to have a reasonable belief that Jacobson was attempting to smuggle. At that point, Voltaire decided to go forward with what you have called an inherently degrading search, the strip search. And this search finds nothing, and he had no probable cause to force Jacobson through this degrading process. After the strip search, McCormick takes Jacobson from the strip search room to the blood test room, and Voltaire didn't have the results of the blood test when he decided to do the strip search, so the results of that are not part of this process. After the blood test, Jacobson is not charged. He's booked and released. The only reason Voltaire gave for the strip search is because McCormick had told Voltaire Jacobson admitted back out at the stop that he had smoked a The jail had a strip search policy that followed, I think, your decision in smoke. And that policy refers over and over again to booking post deputy, and that is Voltaire. Voltaire is the only person who could order Jacobson to go through the strip search. He had to have probable cause that Jacobson had hidden contraband under his scrotum or in his anus, and the strip search was to be private, meaning McCormick could not participate in the strip search as he did. Now, let me ask you this. You started out by saying Florence came after the events in this case. What's your position on whether this search was permissible under the reasoning of Florence? In Florence, Judge, as you know, he had to go into the general population of the jail, and that became the basis of that of that ruling. I think it's bad. What about if I know you think it's bad law, but it is the Supreme Court's decision. So what about the fact that this man was put into a booking area with other inmates or other detainees, I guess would be arrestees, I guess is the right term. Does that I think the difference in the general population, then they change clothes in the booking area and they put on orange clothes and they go into the general population. Here, they strip search him, take all of his clothes, give it back to him before he goes to the blood test room, and then he's released. So I think that's the difference in Florence. Well, was this man ever in a general booking area with other arrestees? There's other arrestees there. It's the first place they come to when they come from the garage into the jail. So it's in the jail, but it's just the booking area where the decision is made what to do with them. And after the blood test, does he go back into the booking area? He goes into the booking area and he's allowed to call for someone to come and get him, and then he sits there until they come to get him. So he's booked and released, Judge. What does this booking area look like? In the briefs, it was described as sort of a doctor's office lobby area. Lobby would be more correct than a doctor's office. There's a long desk where they come in from the jail, and then they do what Voltaire had to do, the criminal check and the different kinds of things there. Is it like a cell, or is it in the same area where folks in the jail are actually working? Are they all in the same location? It's separate from the general population for both males and females of the jail. So this is just where all come in, both males and females. There's female jailers, male jailers. This is just booking in, fingerprinting, photographs. So is all that equipment there as well? Is everybody together, the folks being booked and the people booking them? Or is there a separation where there's sort of a waiting area or a cell where you're sitting all together with your other folks being booked, separate from the people booking them in? There's television and chairs there in the waiting area. There's separate cells for the blood test or breathalyzer test rooms, a separate cell or room for booking in, doing that stuff. So when he's taken into the blood test room, he's simply taken from that general area into a room, and they go through the implied consent there. So the jailers are in a separate room and they call each inmate out for whatever? No, there's a desk, kind of like you're sitting at there, and the jailers are behind that and they're mingling with the crowd. And then they're working with whatever they've got to do to finish the booking in process. This is a situation where under their policy, he never would have been booked in or put into the general population. Let me ask you this. You talked about the description of this booking area. The district court said in its opinion that Jacobson was held in the booking area of the detention center where he was in close contact with other arrestees. That would be correct. Had Jacobson been carrying contraband, he could have passed that contraband to another arrestee who was being detained, and that arrestee could have carried the contraband into the jail. That's true. They're in close contact. They come in with their clothes from the jail garage. Just like Jacobson, they're searched at the scene, they're searched again in the jail sally port or garage. They're padded down, emptied their pockets. So the only place he could have had any kind of controlled substance is under his scrotum or up his anus. That's why I keep emphasizing that after he's in handcuffs, he can't put anything there. So is your basic argument here that there was not sufficient reason to believe that he was concealing contraband, whatever standard we might apply? Voltaire is the only one who could authorize the strip search within the jail, and the only thing he had is a statement from McCormick that McCormick had got from Jacobson that I smoked a bowl of marijuana before you stopped me. That's the end of it. That's the most they have, and then McCormick at the scene does the pat search. They come into the jail. There's another clothing search there. Empty the pockets. Now when they get into the strip search room, the deputy shouldn't have been in there, but he was in there. Now they search his clothing again, so the only thing left is under the scrotum or up his anus, and he couldn't reach that. In the layout of this facility, I'm gathering from what you're saying that if officers had sufficient reason to believe that there could be contraband concealed on the body of a detainee, due to the layout of the booking area, the proximity to other detainees, the body search would be permissible, if there was sufficient reason to believe that the contraband was there. That's correct. Even before Florence, according to, I think it was the decision I mentioned before, Smoke, I think even under that, if they have a reasonable belief that you're trying to smuggle something in, then they do it, and that's why I say in this situation Jacobson doesn't know he's going to be stopped. He doesn't know he's going into the jail. He's got one petty misdemeanor speeding ticket in a quarter of a century, so he's not thinking about smuggling, and they have no reason to believe that he is thinking about that. But now under Florence, as I understand it, if the inmate goes into the general population, the strip search is permitted without regard to any suspicion, right? That's correct. So, why do you say the rationale of Florence would not apply to someone who goes into a general booking area where he's in close contact with other arrestees? My take on Florence is the gang, you don't know who's a gang member and what gang member in the general population, so you have to strip somebody to see if they have tattoos or if they belong to a gang, because if you put them in the wrong place, they get killed. The problem with Florence is I've got a wife and four daughters and a daughter-in-law who regularly hand me parking tickets and speeding tickets, and if I forget to take care of them, under Florence, they can be strip searched. There can be a court order that they be held for a court, which means they go into the general population. In my view, Florence went too far, way too far. Should I go on? Well, you said you wanted to reserve time for rebuttal. It's really up to you, but if you wish to stop now, you may reserve the rest or you may proceed. It's your time. Thank you, Judge. But we can't extend the time at the end, so . . . I understand. Yeah. After the strip search of Jacobson, Voltaire was required by their policy to make a record that the strip search was done and the probable cause for it. He elected not to do so, and I think it's because he didn't have probable cause. The strip search was conducted on September 12, 2009, and shortly after that, Jacobson began requesting the strip search records. Voltaire's supervisor, jail director Sinner, Sergeant Adams, and others said over and over again, the strip search didn't happen. Jacobson is making it up. He's lying. Finally, I scheduled a hearing for April 20, 2010, and served a subpoena in subpoena ducus tecum on Sinner, the director of the jail. The day before the hearing, Sinner's attorneys moved to quash the subpoenas and the court denied the motion. So then on April 20, 2010, Sinner appeared in court and I'm now faced with perjury in that now she produced the records for the strip search and told the court who did it. Voltaire and his supervisors did a cover-up of this strip search for about six and a half months. In this case, our law says that all reasonable inferences shall be made for the appellant plaintiff in the summary judgment process. Following that law, there is only one inference that can be made about Voltaire and his supervisors covering up this strip search, and it is that they knew it violated their policy, I think the smoke case, and the Fourth Amendment. And because of that, I request a reversal of the district court order for both defendants. Thank you. All right. Thank you, Mr. Kennedy. Mr. Griffiths, we'll hear from you. Thank you. Good morning. May it please the court, counsel. I want to start by talking about the setup of the jail, just because it seems to have been a point of some interest here. The record's a little limited because that was set forth by Director Sinner's affidavit. Director Sinner is here today. But basically, her description was it's like a doctor's office. So there's a waiting area, and people come in, after hours in particular, through a sally port from the garage, and they go through the, maybe they get search coming in, maybe they get strip search coming in. They come into a waiting room, and they wait their turn to approach the booking deputy who's at the post. And that person goes through the process of things like, am I going to keep you in housing? Am I going to release you? Are you going to hurt yourself? Are you under the influence of drugs? Things like that. There's two cells in there that are for people who are violent. There's two cells for people who might hurt themselves. And the rest of the folks mingle around. They can sit in chairs. They can make phone calls. There's a TV. And so it's really undisputed that those people are in close contact with one another. And it's really undisputed that if someone got into that facility, they can pass off drugs to someone who's going into the main housing unit. And just because this particular gentleman wouldn't have gone in because of the nature of his offense, it doesn't eliminate the potential risk. Well, is there a separate search conducted before someone goes into the general population? No, the searches are all done before they go into the booking area. And then there's some separate procedures. I guess. All right. Well, that's how they do it. But the question is whether that's a reasonable way to do it. I think that one of the challenges we have here is recognizing the difficult environment that these people work in. And if we look at the opinion in Florence, that's a big part of what that opinion was directed to, is giving deference to those people and deciding how they conduct their business to make sure that the jail stays safe. So we have this gentleman who's the detention deputy. What I was getting at is if they could search the people before they go into the general population. Sure. Why is it reasonable to search the people before they go into the booking area? They could have drugs in the booking area. They could bring weapons into the booking area. There's lots of harm that could happen in the booking area. All right. So protection of the booking area is. Absolutely. I mean, absolutely. And so you're protecting not only the staff, but you're also protecting detainees from one another. You know, counsel made reference, for example, to gangs. I mean, what if someone manages to get in there with maybe a wire in their hair and then they see someone they've got a problem with and they attack them using this potential weapon? So it's critical to this, the operation of the jail and the safety of everyone in there that they do this, these searches before. The rule is then, I hear you say, that anyone that's booked can be strip searched. Under Florence, true. Now, that's not how they do it, and it's not how they do it now with the Olmstead County Adult Detention Center. But if you give Florence the broadest possible reading, there's no limitations there. And the dissent pointed that out, that may, hey, we need some limitations here, but the majority declined to do that. Well, there was some potential limitation in Justice Alito's opinion, which might apply to this scenario. That's true. And I believe he talked about minor offenses, if I recall correctly. But I also think that Justice Kennedy directed that to that in his opinion, where he talked about the fact that even the most minor offenders can be the biggest problems. Well, even under Florence, doesn't there have to be some reason, whatever the level of the person is, possesses, or might possess contraband of some sort? Matter of fact, I think in Florence, there was no evidence that the particular person had any problem. I mean, I think what he was brought in on, I think, not paying a ticket or something like that, or one that had been dismissed, in fact. But in that case, there was no evidence that that particular person had any risk, there was any risk to anyone. And in fact, in those two facilities that he went in and out of, as I recall, the policies were everybody gets searched, which is really much broader than the procedures that we use at Olmstead County, where there has to be at least some assessment. Well, if there was reasonable suspicion here, then this is a narrower case. But if the use of marijuana was not enough to give reasonable suspicion of possession of drugs in a body cavity, then you have to rely on Florence and the permission to search everyone. And I contemplated, you know, I'm really, I think I can make the argument either way, even under pre-Florence. Because one of the challenges these days... What's the reasonable suspicion here? There's a couple of circuits that seem to say being under the influence of drugs is not enough to give reasonable suspicion. I think the distinction here is it wasn't necessarily just that he was under, might have been under the influence of drugs, but it was his admission that I just smoked a bowl of pot. And if you looked at the affidavit that was submitted by the detention deputy, Voltaire, he basically said I had to make sure there wasn't something else on it. And we also have to recognize that, you know, you really got to look at this from the perspective of the detention deputy. They don't know what's going on out there. They don't know who this guy is. They don't know if he just stuffed a bunch of methamphetamine in a private part. Or, you know, this particular facility has had people die in the facility because they've ingested drugs and then that eventually kills them. What was the basis to suspect he had methamphetamine? I just used that as an example. Well, let's talk about this case. Sure. Well, I mean, my point is, is from the perspective of a detention deputy, if someone admits to doing some sort of drugs, there's always in the back of their mind some suspicion that there might be some other drugs. I mean, he could have left his party, taken his pot, put it in a baggie. He could have put it in a body cavity. The people in these detention facilities, they don't know. And that's why they have these procedures to address all these potential problems, because they don't know exactly what these people might have hidden away. It sounds to me like you're arguing that the authority exists constitutionally to conduct a strip search of everybody that's arrested. Even if they're not going to be, even if the officers know that they will never enter the general jail population. If you have a set-up ... I mean, do you strip search traffic offenders? Well, I think there's a distinction. I mean, there's a lot of people that get arrested that never even come to a detention facility, but ... How about someone that doesn't pay their traffic tickets and a warrant is issued, and so they're booked? Can they be strip searched? Under Florence, yes. That's Mr. Florence. Well, on Florence, I think there was a limitation, at least a theme through that opinion, not on the severity of the offense, but on whether they were going to be interacting with other folks. And I think there was a theme of, was there an alternative? Could the detention center have an alternative, like Judge Colleton suggests? Strip search them before they go into the general population? Well, I think you're correct. I think there was an underlying view there of, are there other ways of doing it? I think the majority really, though, ultimately rejected that. I think that out of the deference that's given to the detention facilities to put procedures in place that work best for that facility. Now, theoretically, subject to some physical modifications, could they have done it that way? Potentially, but this facility is known as a direct observation facility, and in all the different housing units, for the most part, people mingle around and are observed by the detention staff at that time. So in this particular case, I think it would take, actually, physical redesign of the detention center to do that. But don't they just pull people into the pink room or something to do a private strip search? Yeah, and the pink room is between the garage and the housing. It just seems if you really want to protect the general population from getting access to anything somebody might bring in, it's actually more efficient to do it after they've mingled. You know for sure you're going to strip search them right before they go into the general population, and then the folks who get released, you just never even have to take the time to do that. What about the safety of the people in the booking area? What about the safety of the jail staff in the booking area? Do you have a couple of searches? There's a search, I'm sure, for weapons and those sorts of the wire in the hair or whatever you were referring to. That's different, right, than the strip search we're talking about here? It is. There's what I'll call a custodial search, which is the pat down that an officer would typically do, perhaps at the car, and then they can physically do those also at the booking station before they come through, and then they can do more thorough searches as they go in. There's no question. I hear you saying there is intermingling of arrestees in the booking area. Absolutely. And so you're reasoning by analogy to Florence that it's close enough to a general population that Florence's reasoning applies. Absolutely. This is a busy place. Or at least, I guess you're saying it's not clearly established that it doesn't apply. I think the number that I had in the record is 5,500 people go through this place. Well, that's in a year. How many were there when Jacobson was there? Others, but I don't know, Judge. But let me say this. Should that matter? I mean, even if it's one, we should have the same procedures for everybody, no matter . . . for consistency's there, or there's one person in there. These detention deputies are trained to do the same thing every time, to follow the same procedures, to handle things a certain way. In this particular case, I argue that even if you're going to apply a pre-Florence analysis, I still believe probable cause existed to conduct the search, just because the person admitted that they had just done drugs. And we've got to make sure that these drugs don't come in where they could be shared with other people who they could be mingling with in that particular . . . So you think if somebody admitted recently using drugs, there's reasonable suspicion to believe they hid the drugs in the body cavity? What I'm saying is there's a possibility in that, and the detention staff has to make the assessment on an individualized basis. But you're saying that's reasonable suspicion. You think that's enough recent use? You don't have to show any other furtive movements to try to hide the drugs or anything like that? I can tell you the way these deputies are trained, based on the policy, it's a combination of all those things. Was there anything here other than recent use? The statement was that the admission of smoking a bowl . . . Smoking a bowl. You think we should say that's reasonable suspicion to believe that he's hiding it in a body cavity? I'm saying that's enough of a reasonable suspicion to justify to a detention staff officer to conduct a search, giving all due deference to the difficulties that those people face. But I think ultimately, I don't think we have to answer that question, because I think Florence doesn't even require us to go there, particularly when we have people who are going to be going in and intermingling with other folks. So if you've got a setup like ours, I think what Florence tells us, and there's going to be this intermingling, I think what Florence tells us is you can strip search anybody. What happened to the appellant? Was there a court appearance? He was booked and released. And would you agree that no one thought, none of the officers thought at any time that this arrestee was going to end up in the general jail population? I believe that that's correct. Additional question, is this a . . . I haven't looked at the complaint, but is this a lawsuit for damages against these officers? Yes. But it's not a qualified immunity case? No, we really haven't gotten to that part of the analysis. The question is, has he stated a claim? Qualified immunity has not been asserted as a defense in the case? Well, I think if you're going to try this case, it could be asserted. I mean, it was asserted. Was it raised in the answer? Yeah, it's an affirmative defense in the answer. Why wouldn't it be raised now? I mean, this is the time it's typically raised to. The purpose of qualified immunity is to prevent the officers from having to go through the process of litigation if the right that's alleged is not clearly established. Well, I think that one of the . . . it's hard for me to think back to what our thought process was at the time of the summary judge of motion, but I think we felt pretty strongly about our position based on Florence. But ultimately, it's pretty easy to make the qualified immunity analysis because the law was well established, I think, about what the grounds were, and that was that there needs to be probable cause for . . . I don't know why you keep saying probable cause. Reasonable suspicion, my apologies. Those are two different levels of standards of proof. It's a significant difference. So, reasonable suspicion in this case . . . we've already addressed that question of did they have reasonable suspicion, and I've argued that they have. And I think under the law in place at that time, he acted in good faith and qualified immunity would apply anyway. But at the end of the day, I think this argument might be different if the layout of this jail was different, but the fact is that anybody coming in that facility is mingling openly with people who are going into the main housing unit. And I think in that particular scenario, the ADC staff had to make sure that nothing came in to that facility, and the officer exercised his best discretion at that time and conducted the search. All right. Thank you for your argument. Thank you. Mr. Griffiths. Mr. Kennedy, we'll hear from you in rebuttal. First of all, the jail policy, the policy that Voltaire was supposed to follow, required probable cause before he could do a strip search. The jail policy also had a flow sheet saying when they could do a strip search or were required to do them, couldn't do them. If you follow through the flow sheet, there was to be no strip search in this situation. Voltaire didn't follow the policy. You know that he didn't put the mark down for the strip search occurred. In fact, for six and a half months, they claimed my client pushed the button, and he didn't put any probable cause for the strip search because there wasn't any. The pre-Florence law on strip searches was there had to be reasonable suspicion. The reasonable suspicion in this case had to be that he was hiding something under his scrotum or in his anal opening because they had been through his clothes three times, and before they make the decision to do the strip search, he's standing naked in front of two men that he's never seen in his life, and that's when they make the decision to do the strip search. They didn't have reasonable cause, nor did they have probable cause. They had no reason to do it. Thank you. Thank you, sir. Thank you both for your arguments. The case is submitted, and the court will file an opinion in due course.